IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 13-cv-01763-PAB

RUTH J. VIGIL,

      Plaintiff,

v.

CAROLYN W. COLVIN, Acting Commissioner of Social Security,

      Defendant.

---

## ORDER

---

      This matter is before the Court on the Complaint [Docket No. 1] filed by plaintiff Ruth Vigil.  Plaintiff seeks review of the final decision of defendant Carolyn W. Colvin (the "Commissioner") denying her claim for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act (the "Act"), 42 U.S.C. §§ 401-33 and 1381-83c.[1]  The Court has jurisdiction to review the Commissioner's final decision under 42 U.S.C. § 405(g).

## I. BACKGROUND

      On August 2, 2010, plaintiff applied for supplemental security income and disability insurance benefits under Title II of the Act.  R. at 19.  Plaintiff alleged that she had been disabled since November 1, 2009.  *Id*.  After an initial administrative denial of his claim, plaintiff received a hearing before an Administrative Law Judge ("ALJ") on

---

[1]The Court has determined that it can resolve the issues presented in this matter without the need for oral argument.

October 19, 2011.  *Id.*  On November 7, 2011, the ALJ issued a decision denying

plaintiff's claim.  *Id.* at 27.  The ALJ found that plaintiff had the following severe

impairments: fibromyalgia, heel spurs, and obesity.  R. at 22.  The ALJ concluded that

these impairments, alone or in combination, did not meet one of the regulations' listed

impairments.  R. at 23.  The ALJ ruled that plaintiff had the residual functional capacity

("RFC") to perform the full range of light work as defined in 20 C.F.R. § 404.1567(b)

and § 416.967(b),[2] such that plaintiff could lift and carry 20 pounds occasionally and ten

pounds frequently and could stand or walk for no more than six hours out of an eight

hour work day and sit the remainder of the day.  R. at 23, 26.  Based upon this RFC

and the testimony of the vocational expert ("VE"), the ALJ concluded that plaintiff was

capable of performing past relevant work as a bartender, bindery worker, and teacher's

aide.  R. at 26.  In the alternative, the ALJ concluded that, based upon plaintiff's RFC,

age, education, and work experience in conjunction with the Medical-Vocational

Guidelines, there are other jobs that exist in significant numbers in the national

economy that plaintiff can also perform.  R. at 26-27.

　　　Plaintiff submitted additional evidence to the Appeals Council.  The Appeals

---

[2]Light work is defined as:
lifting no more than 20 pounds at a time with frequent lifting or carrying of
objects weighing up to 10 pounds.  Even though the weight lifted may be
very little, a job is in this category when it requires a good deal of walking or
standing, or when it involves sitting most of the time with some pushing and
pulling of arm or leg controls.  To be considered capable of performing a full
or wide range of light work, you must have the ability to do substantially all
of these activities.  If someone can do light work, we determine that he or
she can also do sedentary work, unless there are additional limiting factors
such as loss of fine dexterity or inability to sit for long periods of time.
20 C.F.R. § 404.1567

Council accepted into the record evidence marked as Exhibits 11F, 12F, 13F, 14F, and 12E (collectively, the "accepted new evidence"). R. at 5; *see also* R. at 377-419. The Appeals Council concluded that such evidence "does not provide a basis for changing the Administrative Law Judge's decision." R. at 2. The Appeals Council reviewed additional newly submitted evidence in the form of medical records and treatment notes dated after November 7, 2011. *Id.*[3] The Appeals Council concluded that, because the ALJ decided plaintiff's case up to and through November 7, 2011, the rejected new evidence did not affect the question of whether plaintiff was disabled on or before that date. *Id.* As a result, the Appeals Council declined to make the rejected new evidence part of the record. *Id.* On May 22, 2013, the Appeals Council issued a ruling denying plaintiff's request for review of this denial. R. at 1.

On November 27, 2013, plaintiff filed an Opposed Motion to Supplement the Administrative Record. Docket No. 18. Plaintiff asserts that she sent the Appeals Council 40 pages of additional records and that the Appeals Council received them. Docket No. 18 at 1. Plaintiff asserts that she sent nine additional pages "on June 6, 2013 (earlier sent on May 8, 2013)." *Id.* at 1. On August 26, 2013, the Appeals Council acknowledged receipt of "a Statement from the Claimant and a Work Performance Assessment" and concluded that this evidence "does not appear to change the outcome." Docket No. 18-1. Plaintiff filed the 49 pages of additional records described in her motion as Docket No. 18-2.

---

[3]The Court refers to the evidence described in the first full paragraph of page two of the record as "rejected new evidence."

3

## II.  ANALYSIS

### A.  Standard of Review

Review of the Commissioner's finding that a claimant is not disabled is limited to determining whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole.  *See Angel v. Barnhart*, 329 F.3d 1208, 1209 (10th Cir. 2003).  The district court may not reverse an ALJ simply because the court may have reached a different result based on the record; the question instead is whether there is substantial evidence showing that the ALJ was justified in her decision.  *See Ellison v. Sullivan*, 929 F.2d 534, 536 (10th Cir. 1990).  "Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007).  Moreover, "[e]vidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion."  *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992).  The district court will not "reweigh the evidence or retry the case," but must "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met."  *Flaherty*, 515 F.3d at 1070.  Nevertheless, "if the ALJ failed to apply the correct legal test, there is a ground for reversal apart from a lack of substantial evidence."  *Thompson v. Sullivan*, 987 F.2d 1482, 1487 (10th Cir. 1993).

### B.  The Five-Step Evaluation Process

To qualify for disability benefits, a claimant must have a medically determinable

physical or mental impairment expected to result in death or last for a continuous period of twelve months that prevents the claimant from performing any substantial gainful work that exists in the national economy.  42 U.S.C. § 423(d)(1)-(2).  Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A) (2006).  The Commissioner has established a five-step sequential evaluation process to determine whether a claimant is disabled.  20 C.F.R. § 404.1520; *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988).  The steps of the evaluation are:

> (1) whether the claimant is currently working; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets an impairment listed in appendix 1 of the relevant regulation; (4) whether the impairment precludes the claimant from doing his past relevant work; and (5) whether the impairment precludes the claimant from doing any work.

*Trimiar v. Sullivan*, 966 F.2d 1326, 1329 (10th Cir. 1992) (citing 20 C.F.R. § 404.1520(b)-(f)).  A finding that the claimant is disabled or not disabled at any point in the five-step review is conclusive and terminates the analysis.  *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 801 (10th Cir. 1991).

The claimant has the initial burden of establishing a case of disability.  However, "[i]f the claimant is not considered disabled at step three, but has satisfied her burden of establishing a prima facie case of disability under steps one, two, and four, the burden shifts to the Commissioner to show the claimant has the residual functional capacity

5

(RFC) to perform other work in the national economy in view of her age, education, and work experience." *See Fischer-Ross v. Barnhart,* 431 F.3d 729, 731 (10th Cir. 2005); *see also Bowen v. Yuckert,* 482 U.S. 137, 146 n. 5 (1987). While the claimant has the initial burden of proving a disability, "the ALJ has a basic duty of inquiry, to inform himself about facts relevant to his decision and to learn the claimant's own version of those facts." *Hill v. Sullivan,* 924 F.2d 972, 974 (10th Cir. 1991).

### C. The ALJ's Decision[4]

#### 1. RFC

Plaintiff contends that the ALJ failed to consider the combined impact of her severe and non-severe impairments. Docket No. 17 at 11. Plaintiff first argues that the ALJ erred in concluding that her diabetes did not preclude her from performing light work. *Id.* at 12. In concluding that plaintiff's diabetes did not constitute a severe impairment, the ALJ concluded that plaintiff's diabetes could be managed with medication and/or dietary compliance. R. at 22. In evaluating plaintiff's credibility, the ALJ noted plaintiff's testimony that her diabetes affected her legs and feet and that she missed three days of work per month because her legs would not function and medication made her drowsy. R. at 23. The ALJ noted that recent treatment records indicated that plaintiff had "uncontrolled diabetes, without complications," but that plaintiff did not follow her treatment providers' recommendations to call in blood sugar

---

[4]If the Appeals Council considers new evidence pursuant to § 404.970(b), such evidence becomes part of the record the Court uses in evaluating whether substantial evidence supports the ALJ's decision. *Chambers v. Barnhart*, 389 F.3d 1139, 1142 (10th Cir. 2004). Thus, the Court will review the accepted new evidence in determining whether the ALJ's decision rests upon substantial evidence.

readings, present for laboratory testing and education, follow up, and alter her diet.  R. at 24.  The ALJ found that, in December 2009, plaintiff had normal sensory examinations in her feet; in March 2011, plaintiff admitted to no abnormal sensation or burning in her extremities; and, in July 2011, her lower extremities were sensitive to soft touch and pinprick.  R. at 24.  The ALJ found that plaintiff reported medication side effects of shakiness and weakness only once, in February 2011, but she did not otherwise report medication side effects to her primary treatment provider.  R. at 24.

During a July 17, 2008 visit, plaintiff's treatment provider stated that plaintiff was "advised I can't follow up on her diabetes if she won't get the labs.  These were ordered in March and she still hasn't gotten them done."  R. at 238.  In December 2009, plaintiff underwent a diabetic check at Peak Vista Community Health Centers ("Peak Vista") and did not complain of numbness in her feet or medication side effects.  R. at 210-211.  The provider's objective assessment did not reveal any abnormalities in plaintiff's feet, and the provider prescribed Lantus, directing plaintiff to follow up as needed.  R. at 211-212.  On February 16, 2010, plaintiff reported to Peak Vista with swelling in her left foot and was diagnosed with plantar fasciitis.  R. at 206-07.  On November 16, 2010, plaintiff visited Peak Vista for a diabetes follow up, complaining of aching feet, but the note also states that plaintiff "went to only one Health Education class, and never followed through."  R. at 359; *see also* R. at 362-63 ("Pt has a history of non-compliance with labs, follow up, and following through with health education.").  The treating provider's assessment suggested that plaintiff suffered from diabetic neuropathy.  R. at 362.  On December 13, 2010, plaintiff visited Peak Vista for diabetes education, where plaintiff and her provider discussed calling in her blood sugar to the

7

health education department for possible insulin adjustment, altering her diet, and the importance of exercise.  R. at 317.  On February 16, 2011, plaintiff reported to Peak Vista complaining about numbness in her left knee and foot.  R. at 311.  She admitted that she was not calling in her blood sugar readings as suggested.  *Id.*  Plaintiff was prescribed Janumet and directed to follow up in three weeks.  R. at 314.  On March 29, 2011, plaintiff visited Peak Vista for a follow-up and, although plaintiff appeared to complain about burning sensation in her extremities, R. at 343, that symptom does not appear to have been present the day of the visit.  R. at 344.[5]  Plaintiff reported to consultative physician Dr. William Qutub that she was diagnosed with neuropathy and reported that, although her feet "get[] tingly," she had normal sensations to contact at the skin level of her feet.  R. at 325.  Dr. Qutub's physical examination revealed that plaintiff was "[s]ensate to soft touch and pinprick in bilateral lower extremities."  R. at 330.

Plaintiff has two principal arguments that the ALJ erred in evaluating plaintiff's diabetes.  First, plaintiff argues that the ALJ erred in finding that her diabetes was effectively managed by prescription drugs and dietary compliance.  Docket No. 17 at 12.  While plaintiff is correct that her medications and dosages were adjusted periodically, this does not, by itself, undermine the ALJ's conclusion regarding the severity of plaintiff's diabetes and plaintiff's credibility regarding her diabetes-related

---

[5]Plaintiff cites to a September 2011 examination of plaintiff's left hand performed by Dr. Katharine Leppard, which revealed mild neuropathy in the median nerve of the left wrist, R. at 381, but Dr. Leppard evaluated plaintiff after her May 2011 left wrist injury and Dr. Leppard's note does not suggest that this condition is related to plaintiff's diabetes.

symptoms. *See, e.g.*, R. at 215, 229. The medical records plaintiff cites in her reply brief with respect to this issue are emergency department records and do not evidence persistent limitations or otherwise overwhelm the ALJ's conclusion. *See* Docket No. 21 at 3 (citing R. at 285-86, 294). Although the record indicates that plaintiff occasionally suffered a burning or tingling sensation in her hands or feet, plaintiff's treatment records do not indicate that such symptoms persisted in the face of medication adjustments and provider-directed followup or that such symptoms significantly limit plaintiff's physical or mental ability to do basic work activities. *See* § 404.1520(c).

Second, plaintiff argues that the ALJ concluded that plaintiff's "uncontrolled diabetes did not exist or, if it did, [it] was due to medical noncompliance" and that such a conclusion is inconsistent with treatment records that show plaintiff's blood sugar was abnormally high even when plaintiff complied with her providers' directions. Docket No. 17 at 12 (citation omitted). Plaintiff misinterprets the ALJ's conclusion. The ALJ specifically found that treatment notes described plaintiff's condition as "uncontrolled diabetes, without complications" and that plaintiff claimed to have blood sugar readings in the 400s, but the ALJ concluded that plaintiff's failure to follow her providers' instructions suggested that plaintiff's symptoms were not as severe as she claimed. R. at 24. Substantial evidence supports the ALJ's conclusion. Although plaintiff correctly notes that her providers described her diabetes as "uncontrolled," *see* R. at 230, this does not, by itself, lead to the conclusion that plaintiff's diabetes was a severe impairment or that the ALJ erred in concluding that plaintiff's subjective complaints were not credible. Treatment records and Dr. Qutub's consultative examination do not suggest that plaintiff suffered the symptoms she claimed. Although, as plaintiff points

9

out, Dr. Qutub suspected that plaintiff may suffer from early onset lower extremity neuropathy, he also questioned plaintiff's "noncompliance given recent changes in insulin with unacceptably elevated glucose levels" and did not suggest any related functional limitations.  R. at 330.  Moreover, in addition to the above-cited evidence, there are also other instances in the record where plaintiff's treatment notes indicate that she has failed to follow up as suggested by her treating providers.  *See* R. at 239, 223, 255.  Plaintiff's arguments that the ALJ failed to properly consider her diabetes diagnosis are therefore rejected.

Plaintiff argues that the ALJ erred in failing to include in her RFC that she would be required to miss two to three days of work per month "when her legs were painful and wouldn't work."  Docket No. 17 at 12.  The ALJ noted plaintiff's claim that she missed multiple days of work each month due to leg problems.  However, as discussed above, the medical records do not indicate that plaintiff's claimed problems with her lower extremities persisted or could not be effectively managed with medication.  If indeed plaintiff's legs "wouldn't work" on certain days, she does not appear to have consistently mentioned such an issue to her treating providers.  The ALJ's implicit decision not to include such a limitation in plaintiff's RFC is therefore supported by substantial evidence.

Plaintiff appears to argue that the ALJ erred in considering her asthma. However, plaintiff's lone argument on the issue is that "[a]sthma did pose limitations as well, in that she had to avoid perfumes, cleaning supplies, smoke and hot weather." Docket No. 17 at 13 (citing R. at 326).  Plaintiff does not otherwise explain why this assertion warrants reversing the ALJ's decision, which is, by itself, a sufficient basis to

reject plaintiff's argument.  Moreover, plaintiff's citation to Dr. Qutub's examination

report does not support plaintiff's argument.  With regard to plaintiff's asthma, Dr.

Qutub's report states:

> She has a history of asthma, but indicates that it is well controlled.  She
> currently has Symbicort and Proventil for symptom management.  "I do better
> in the cold than the hot" weather.  She describes trigger factors to include
> perfumes, cleaning supplies, as well as hibachi-style restaurants.   Her
> symptoms include chest discomfort and coughing.  "I swell up sometimes."
> She indicates that her most consistent symptom[], however, is coughing.

R. at 326.  By plaintiff's own admission, her asthma is well controlled, which supports

the ALJ's conclusion that plaintiff's asthma can be managed with medication and is not

therefore a severe impairment.  *See* R. at 22.  Plaintiff does not identify any evidence in

the record suggesting that plaintiff's asthma places any significant limitation on her

ability to perform past relevant work.  *See* Docket No. 21 at 3 (citing R. at 236, 337).

Plaintiff has therefore failed to identify any error in the ALJ's consideration of plaintiff's

asthma.

Plaintiff next argues that the ALJ erred in failing to conclude that plaintiff suffered

from a hand impairment and appears to contend that some sort of manipulative

limitation should have been included in plaintiff's RFC.  Docket No. 17 at 13.  With

regard to plaintiff's complaints regarding loss of hand mobility, the ALJ noted that

physical examinations of plaintiff's right hand revealed no more than tenderness and

that the record, including Dr. Qutub's examination report, did not contain any other

observations of hand dysfunction.  R. at 22.  The ALJ concluded that, in the absence of

objective evidence, plaintiff's claimed loss of hand mobility was not a medically

determinable impairment.  *Id.*

Plaintiff's argument primarily consists of citations to medical records and examination reports that she contends establish the existence of a hand impairment. Docket No. 17 at 13.  Because the Court cannot reweigh the evidence, the relevant question raised by plaintiff's argument is whether substantial evidence exists to support the ALJ's decision not to include manipulative limitations in plaintiff's RFC.  The Court first turns to evidence that plaintiff's right hand mobility was limited.  On June 2, 2010, plaintiff visited Peak Vista complaining that she was unable to straighten her right ring finger and was in considerable pain.  R. at 203-04.  Plaintiff was referred to a specialist, although it is not entirely clear whether she subsequently visited a specialist for this concern.  *Id.*  On August 3, 2010, plaintiff visited the Memorial Health System ("Memorial") emergency department complaining of worsening right hand pain for the past two months, stating that she clenches her right first when sleeping and wakes up with right hand pain.  R. at 280.  An x-ray of plaintiff's right hand was negative and the treating physician diagnosed plaintiff with "an ulnar neuropathy from clenching her right fist at night when she sleeps," directing plaintiff to follow up with her regular doctor and a neurologist.  R. at 281.  On August 18, 2010, a state agency representative interviewed plaintiff and noted that, by the end of the interview, plaintiff was unable to shake hands with her right hand.  R. at 149.  Plaintiff's Peak Vista records dated November 16, 2010 and after do not indicate that she raised right hand mobility difficulties with her treating providers or that any condition limiting her right hand mobility persisted  R. at 359, 353, 348.

Plaintiff's argument also relies on the November 5, 2010 findings of state agency physician Dr. Francis Yamamoto.  R. at 52-55.  Dr. Yamamoto's analysis stated that

"[t]he field office noted hand difficulty.  Buttons and zippers are difficult" and referenced plaintiff's June 2, 2010 and August 3, 2010 medical visits for right hand difficulties.  R. at 52.   Dr. Yamamoto concluded that plaintiff's handling and fingering ability with her right hand was "limited."  R. at 55.  However, the ALJ afforded Dr. Yamamoto's manipulative restrictions no weight given the absence of objective evidence to support such restrictions.  R. at 25.  Plaintiff argues that the June 2, 2010 treatment record "should be considered adequate 'medical signs' to support Dr. Yamamoto's opinion," Docket No. 17 at 13, but such an argument invites the Court to reweigh the evidence, an invitation which the Court declines.  The fact that plaintiff's medical records do not indicate that she continued to complain to her providers of right hand issues, combined with the fact that Dr. Qutub's July 2011 examination revealed no manipulative limitations, constitutes substantial evidence in support of the ALJ's decision not to include in plaintiff's RFC right hand manipulative limitations.

The Court turns to evidence in the record indicating left hand manipulative limitations.  On November 3, 2009, plaintiff visited the Memorial emergency department complaining that, due to swelling in her left hand, she was unable to remove her wedding ring.  R. at 285.  The treatment notes indicate that, after the ring was cut off, her finger looked better and her finger pain resolved.  R. at 286.  Plaintiff does not identify any evidence in the record suggesting that this condition persisted.  On May 13, 2011, plaintiff fell and injured her left wrist.  R. at 385.  Plaintiff attended seven physical therapy sessions at Excel Physical & Occupational Therapy P.C. ("Excel") from May 31 to July 15, 2011, canceled one visit, and failed to attend five other visits.  R. at 388.  She was discharged from therapy for lack of subjective improvement.  *Id.*  On August 8,

2011, plaintiff visited Premier Orthopedics and saw Dr. Timothy Hart, who referred her to Dr. Leppard for electromyography ("EMG").  R. at 413.  On September 7, 2011, plaintiff visited Dr. Leppard, complaining of persistent pain in her left wrist and thumb as well as numbness and weakness in her left hand.  R. at 377.  Dr. Leppard's examination and EMG revealed evidence of mild "left median mononeuropathy at the wrist," but there is no indication that this condition would cause the manipulative limitations plaintiff suggests or that this condition would persist if treated properly.  *See* R. at 378.  On September 15, 2011, Dr. Hart determined that it was appropriate to schedule surgery, R. at 412, and, on October 25, 2011, Dr. Hart performed a left wrist carpal tunnel release and a left wrist first dorsal compartment release.  R. at 409.  On November 2, 2011, Dr. Hart saw plaintiff for a post-operative visit and referred plaintiff for postoperative physical therapy.  R. at 407.  Dr. Hart temporarily limited plaintiff from using her left arm.  On November 8, 2011, plaintiff visited Excel for an initial, post-surgery evaluation and reported continued pain and numbness in her left wrist.  R. at 383-85.  The examining physical therapist indicated that plaintiff was to attend therapy sessions twice a week for four weeks and indicated that the long term goal was for plaintiff to return to work and daily activities without discomfort.  R. at 385-86.[6]  On November 14, 2011, plaintiff saw Dr. Hart.  R. at 405.  The note from that visit states

---

[6]The November 8, 2011 Excel treatment note is internally inconsistent.  In one portion, the note states that plaintiff had surgery for a left carpal tunnel release and first dorsal compartment release and is wearing a brace on the left wrist.  R. at 385.  However, in the Objective Findings section of the note, plaintiff's right wrist and thumb are discussed.  *Id.*  Subsequent records interpreting the November 8, 2011 note indicate that the subject of plaintiff's physical therapy was her left hand and wrist.  *See* Docket No. 18-2 at 27.  Thus, the November 8, 2011 note's reference to the right wrist appears to be a typographical error.  Neither party argues otherwise.

that the surgery wounds are well healed, that the numbness and tingling have essentially resolved, and that plaintiff has no pain in the radial aspect of her left wrist. *Id.* Dr. Hart concluded that plaintiff could return to work "full duty" on December 5, 2011. *Id.* The remainder of the evidence that plaintiff relies on to support her claim that her left hand mobility was impaired is not part of the record and is addressed below.

To the extent plaintiff argues that her RFC should have included left hand manipulative restrictions, the accepted new evidence and the evidence before the ALJ do not undermine the ALJ's RFC. There is no evidence that the condition plaintiff reported on November 3, 2009 persisted. Although plaintiff suffered some sort of injury to her left wrist in May 2011, Dr. Hart was of the opinion that, within 6 weeks after the procedure on her left wrist, plaintiff could return to work without limitations. *See* R. at 405. Plaintiff does not identify any evidence in the record suggesting that plaintiff's left wrist condition was considered, on or before the date of the ALJ's decision, to be a long-term impairment. As a result, the Court finds that the ALJ's RFC is supported by substantial evidence and that the new evidence submitted to the Appeals Council on this issue does not overwhelm the ALJ's decision. *See O'Dell v. Shalala*, 44 F.3d 855, 859 (10th Cir. 1994).

### 2. Medical Opinions

In assessing a medical opinion, an ALJ must consider the supportability of that opinion, i.e., the extent to which the medical source provides relevant evidence to support his or her opinion, 20 C.F.R. § 416.927(c)(3), as well as the extent to which a

medical opinion is consistent with the record as a whole.  20 C.F.R. § 416.927(c)(4).

An ALJ may not, however, "substitut[e] his own medical judgment for that of mental

health professionals."  *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996); *see also*

*Pietrunti v. Director, Office of Workers' Compensation Programs*, 119 F.3d 1035, 1042

(2d Cir. 1997) ("an ALJ cannot arbitrarily substitute his own judgment for competent

medical evidence"); *Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990) ("Common

sense can mislead; lay intuitions about medical phenomena are often wrong."); *Proctor*

*v. Astrue*, 665 F. Supp. 2d 1243, 1255 (D. Colo. 2009).

According to Social Security regulations, in deciding the weight given to any

medical opinion, an ALJ is to consider the following factors:

> (1) the length of the treatment relationship and the frequency of examination;
> (2) the nature and extent of the treatment relationship, including the
> treatment provided and the kind of examination or testing performed; (3) the
> degree to which the physician's opinion is supported by relevant evidence;
> (4) consistency between the opinion and the record as a whole; (5) whether
> or not the physician is a specialist in the area upon which an opinion is
> rendered; and (6) other factors brought to the ALJ's attention which tend to
> support or contradict the opinion.

*Watkins v. Barnhart*, 350 F.3d 1297, 1300-01 (10th Cir. 2003); *see* 20 C.F.R.

§ 416.927(c).  The ALJ's decision must be sufficiently specific so as to make clear the

weight he gave to a medical opinion, but the ALJ is not required to expressly apply each

of the factors in deciding what weight to give a medical opinion.  *Oldham v. Astrue*, 509

F.3d 1254, 1258 (10th Cir. 2007).

Although plaintiff argues that the ALJ's reason for rejecting Dr. Yamamoto's

opinion was not supported by substantial evidence, Docket No. 17 at 13-14, as

discussed above, the evidence plaintiff identifies in support of such an argument is

insufficient to overwhelm the ALJ's determination that no objective evidence supported

Dr. Yamamoto's suggested manipulative restrictions.  *See Musgrave*, 966 F.2d at 1374.

Plaintiff challenges the ALJ's treatment of Dr. Qutub's opinions.  Docket No. 17

at 14.  The record contains two opinions from Dr. Qutub.  The first is a narrative opinion

(the "narrative opinion"), R. at 325-31, in which Dr. Qutub opines that plaintiff is limited

to 6 hours of standing or walking, with rest breaks approximately every 60 minutes if

standing or walking is continuous for 60 minutes (the "rest break limitation"), and limited

to frequently carrying 20 pounds and occasionally carrying 30 pounds.  R. at 330.  The

narrative opinion stated that "no postural or manipulative limitations [are] recommended

at this time."  *Id.*  Dr. Qutub's second opinion is a document entitled Medical Source

Statement of Ability to do Work-Related Activities (Physical) (the "check box opinion"),

R. at 333-38, which expresses Dr. Qutub's opinions in a check list or "check box"

format.  R. at 338.  The check box opinion indicated that plaintiff could occasionally

carry as much as 50 pounds, that plaintiff could stand and/or walk for four to five hours

in an 8 hour work day, that plaintiff could never climb ladders or scaffolds and

occasionally perform other postural activities, and that plaintiff should only occasionally

be exposed to unprotected heights, extreme cold, and extreme heat.  R. at 333-37.

The ALJ appropriately recognized the inconsistencies in the two opinions.  R. at 25.

The ALJ afforded great weight to the narrative opinion, but concluded that there was no

basis for adopting the narrative opinion's rest break limitation, noting that breaks every

two hours would be accommodated by a normal work schedule.  *Id.*  The ALJ

concluded that the check box opinion was extreme when compared to Dr. Qutub's

examination findings and afforded it lesser weight, but only to the extent the check box

and narrative opinions were consistent.  *Id.*

Plaintiff first argues that the ALJ was required to contact Dr. Qutub to explain the inconsistencies between his two opinions.  Docket No. 17 at 14 (citing *Thompson v. Sullivan*, 987 F.2d 1482 (10th Cir. 1993)).  The Commissioner "must recontact a treating physician when the information the doctor provides is inadequate . . . to determine whether you [the claimant] are disabled."  *White v. Barnhart*, 287 F.3d 903, 908 (10th Cir. 2001) (quotation omitted).  It is the inadequacy of evidence received from a treating physician – not the ALJ's rejection of the treating physician's opinion – that triggers this duty.  *Id.*  Because Dr. Qutub is not a treating physician, it is not clear whether this duty applies to information received from Dr. Qutub.  Moreover, plaintiff does not contend that Dr. Qutub's opinions did not provide sufficient medical opinion evidence with which to make a disability determination, nor would such a contention have merit.  Where evidence in the record is in conflict, it falls upon the ALJ to resolve such conflicts and it is inappropriate to "reweigh that evidence and substitute [the Court's] judgment for his."  *Id.*  Thus, the Court rejects plaintiff's argument.

Plaintiff argues that the ALJ improperly discounted the narrative opinion's rest break limitation.  Docket No. 17 at 15.  The Court disagrees.  The ALJ concluded that the narrative opinion did not contain sufficient support for the rest break limitation.  R. at 25.  Substantial evidence supports this conclusion.  Dr. Qutub's examination notes state that "[a]mbulation did not appear ataxic or antalgic during our exam.  However, following our exam, she appeared uncomfortable ambulating out of the room with visible guarding, primarily with her swing and heel-strike phases of gait.  During our

18

exam, she is able to stand and walk on her heel and toes." R. at 329. Plaintiff's lower

extremities were otherwise normal. *Id.* The narrative opinion states that plaintiff's

bilateral lower extremity strength is "5/5." R. at 330. Plaintiff does not identify any

particular aspect of the narrative opinion that supports the rest break limitation and

therefore fails to establish that the ALJ committed reversible error in rejecting the rest

break limitation as unsupported by Dr. Qutub's examination findings.

Plaintiff appears to argue that the ALJ erred in discounting the check box

opinion's standing and walking limitation and the check box opinion's postural and

environmental limitations. Docket No. 17 at 15. However, the ALJ appropriately

concluded that such limitations were unsupported by the examination findings set forth

in the narrative opinion. Plaintiff does not point to any specific aspect of Dr. Qutub's

examination findings that undercuts the ALJ's rejection of the check box opinion's

standing and walking limitation. The narrative opinion explicitly stated that plaintiff had

no postural limitations and, although the narrative opinion diagnosed plaintiff with

diabetes, obesity, plantar faciitis, and asthma, it did not mention environmental

limitations. Where the check box opinion was inconsistent with the better-supported

narrative opinion, it was within the ALJ's discretion to elevate the narrative opinion

above the check box opinion. *Cf. Chapo v. Astrue,* 682 F.3d 1285, 1293 (10th Cir.

2012) (finding that an ALJ was "justified in rejecting [a] summary RFC opinion (related

in check-box/fill-in-the-blank format with no explanation or supporting report)").

Because the ALJ provided sufficient reasons for rejecting portions of the check box

opinion inconsistent with the narrative opinion, the ALJ did not, as plaintiff argues,

impermissibly "pick and choose from a medical opinion, using only those parts that are

19

favorable to a finding of nondisability." *See Robinson v. Barnhart*, 366 F.3d 1078, 1083 (10th Cir. 2004). Plaintiff has therefore failed to establish that the ALJ erred in considering the medical opinion evidence of record.[7]

### 3. Credibility

"Credibility determinations are peculiarly the province of the finder of fact" and the Tenth Circuit will uphold such determinations, so long as they are supported by substantial evidence. *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995). Credibility determinations should not be conclusory, but instead "closely and affirmatively linked" to evidence in the record. *Id.* In assessing a claimant's credibility, an ALJ must consider the following factors, in addition to the objective medical evidence:

1. The individual's daily activities;

2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996); *see also* 20 C.F.R. 404.1529(c)(4)

---

[7]Plaintiff's arguments with respect to Dr. Schalin's report are addressed below.

("We will consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between your statements and the rest of the evidence . . . ."). The ALJ must set forth "the specific evidence he relies on in evaluating the claimant's credibility," but is not required to undergo a "formalistic factor-by-factor recitation of the evidence." *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000).

Plaintiff first argues that the ALJ erred in evaluating plaintiff's subjective complaints of diabetes-related symptoms. Docket No. 17 at 16. However, as discussed above, substantial evidence supports the ALJ's determination that plaintiff's diabetes-related symptoms are not as severe as claimed. The record indicates that plaintiff, on occasion, suffered from burning or tingling sensations in her hands or feet, but plaintiff's treatment records do not indicate that such a condition persisted or was uncontrolled by medication and provider-directed followup. Moreover, substantial evidence supports the ALJ's conclusion that plaintiff failed to consistently follow the advice of her providers with respect to managing her diabetes. *See* SSR 96-7p, 1996 WL 374186, at *3. Plaintiff has therefore failed to identify reversible error in this aspect of the ALJ's decision.

Plaintiff argues that the ALJ erred in concluding that plaintiff had the "ability to perform work that appears to exceed her claimed limitations." Docket No. 17 at 16 (citing R. at 26). Plaintiff argues that, in fact, she only worked 20-22 hours per week, that she could only work four hours per day, and that she missed two or three days a month due to leg symptoms. *Id.* Plaintiff's argument primarily asks the Court to reweigh the evidence. Rather, the appropriate question raised by plaintiff's argument is whether substantial evidence supports the ALJ's conclusion that plaintiff had the "ability to

perform work that appears to exceed her claimed limitations." R. at 26. "Even if the work you have done was not substantial gainful activity, it may show that you are able to do more work than you actually did." 20 C.F.R. § 404.1571. The ALJ noted that plaintiff worked 20 hours per week assisting disabled individuals with activities, which included driving a van and taking clients with behavioral problems back to the center. R. at 23. The ALJ also noted that plaintiff claimed to miss three days of work per month due to leg symptoms and the medication side effects made her drowsy. *Id.* On the other hand, plaintiff's claimed limitations are, among other things, that she is only sometimes able to drive, R. at 326, that her typical day is staying at home in bed, *id.*, and that she suffers from extreme manipulative limitations. R. at 41. Thus, a reasonable mind might accept the ALJ's conclusion that plaintiff's work related activities were inconsistent with her claimed limitations, particularly her claim that a typical day is spent at home in bed. *See Flaherty*, 515 F.3d at 1070.

Plaintiff argues that the ALJ erred in failing to address plaintiff's "limited daily activities." Docket No. 17 at 17. Plaintiff argues that the ALJ should have considered her statement to Dr. Qutub that she spends her typical day "at home, in bed," R. at 326; *see also* R. at 172; plaintiff's subjective complaints to providers that she suffered from fatigue with normal activities, *see, e.g.*, R. at 210; plaintiff's subjective complaint that her hand impairment affected her ability to use a knife, buttons, or zippers; and a variety of other evidence plaintiff argues establishes that she engaged in limited daily activities. Docket No. 17 at 17-19. However, the ALJ need not discuss every piece of evidence, and plaintiff fails to establish that this evidence is uncontroverted or so significantly

probative as to trigger the ALJ's duty to explicitly discuss it.  *See Clifton*, 79 F.3d at

1009-10.  Moreover, the ALJ was not required to engage in a factor-by-factor analysis of

evidence relating to plaintiff's credibility.  *See Qualls*, 206 F.3d at 1372.  The ALJ set

forth the specific evidence he relied on in evaluating plaintiff's credibility.  *See* R. at 23-

24.  Plaintiff has failed to establish that the evidence she now identifies overwhelms the

evidence underlying the ALJ's credibility determination.  Although plaintiff may disagree

with how the ALJ weighed evidence relevant to plaintiff's credibility, *see* Docket No. 17

at 17-19, plaintiff's argument is little more than an implicit request to reweigh the

evidence, which the Court cannot do.  Plaintiff has therefore failed to establish that the

ALJ erred in his credibility determination.

### D.  New Evidence

The submission of new evidence to the Appeals Council is governed by 20 C.F.R.

§§ 404.970(b) and 416.1470(b).  Section 404.970(b) states:

> If new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision. The Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the period on or before the date of the administrative law judge hearing decision. It will then review the case if it finds that the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record.

Section 416.1470(b) states:

> In reviewing decisions based on an application for benefits, if new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision.  In reviewing decisions other than those based on an application for benefits, the Appeals Council shall evaluate the entire record including any new and material evidence submitted. It will then review the case if it finds that the administrative law judge's action,

findings, or conclusion is contrary to the weight of the evidence currently of record.

If the Appeals Council determines that the newly submitted evidence is not new, material, or temporally relevant and therefore declines to consider it, the Appeals Council's determination is reviewed de novo. *Chambers*, 389 F.3d at 1142. "Evidence is new within the meaning of [20 C.F.R. §§ 404.970(b) and 416.1470(b)] if it is not duplicative or cumulative." *Lawson v. Chater*, 1996 WL 195124 at *2 (10th Cir. Apr. 23, 1996) (unpublished) (citing *Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991)). "Evidence is material to the determination of disability if there is a reasonable possibility that [it] would have changed the outcome." *Lawson*, 1996 WL 195124 at *2 (unpublished table opinion) (citing *Wilkins*, 953 F.2d at 96). Evidence is "chronologically relevant" if it "relates to the period on or before the date of the [ALJ's] decision." *O'Dell v. Shalala*, 44 F.3d 855, 858 (10th Cir. 1994); *see also Chambers*, 389 F.3d at 1143; *Jones v. Callahan*, 122 F.3d 1148, 1154 (8th Cir. 1997) ("An implicit requirement is that the new evidence pertain to the time period for which benefits are sought, and that it not concern later-acquired disabilities or subsequent deterioration of a previously non-disabling condition."). New evidence showing that plaintiff's condition deteriorated "significantly after the date of the Commissioner's final decision is not a material basis for remand, although it may be grounds for a new application for benefits." *Jones*, 122 F.3d at 1154.

Plaintiff's arguments regarding new evidence are difficult to follow. By virtue of the fact that plaintiff's opening brief references plaintiff's October 25, 2011 left wrist surgery, *see* Docket No. 17 at 10 (citing R. at 409-410), plaintiff implicitly argues that the

Appeals Council erred in concluding that the accepted new evidence did not constitute a basis for revisiting the ALJ's decision.  To whatever extent plaintiff asserts such an argument, it is without merit.  For the reasons discussed above, *see supra* at 15, the ALJ's decision was based upon substantial evidence, even in light of the accepted new evidence.  *See Chambers*, 389 F.3d at 1142.

By virtue of the fact that plaintiff's opening brief references various pieces of rejected new evidence, *see, e.g.*, Docket No. 17 at 10, plaintiff implicitly argues that the Appeals Council improperly declined to add to the record various pieces of the rejected new evidence.  Plaintiff's motion to supplement adds yet another wrinkle to this argument because Docket No. 18-2 does not include all of the rejected new evidence and appears to contain documents that the Appeals Council did not explicitly reference.  For example, the Appeals Council considered and rejected treatment notes from Premier Orthopedics dated January 30 through March 19, 2012.  R. at 2.  However, Docket No. 18-2 does not contain any such treatment notes and they do not appear elsewhere in the record or docket.  Rather, Docket No. 18-2 contains only two pages of records from Premier Orthopedics dated October 17, 2011, records which the Appeals Council did not appear to include in the record or explicitly reject.  Docket No. 18-2 at 3-4.  Thus, plaintiff's assertion that the Appeals Council "expressly declined to enter [the documents contained in Docket No. 18-2] into the record because they followed the November 7, 2011 decision" is not entirely accurate.  *See* Docket No. 18 at 1.[8]  The

---

[8]Although plaintiff does not provide evidentiary support for her assertion that the Appeals Council received the 40 pages of documents she provided on February 21, 2013, *see* Docket No. 18 at 1, for purposes of resolving this motion, the Court assumes plaintiff's assertion is true.

Court will therefore consider in turn each category of evidence implicated by the Appeals Council's decision and plaintiff's motion to supplement.

Of the rejected new evidence the Appeals Council expressly mentioned, Docket No. 18-2 does not include, and plaintiff does not otherwise provide, "treatment notes from Premier Orthopedics dated January 30-March 19, 2012," "treatment notes from Peak Vista Community Health Centers dated December 10, 2011-January 16, 2013," "an electromyography/nerve conduction study from Dr. Katharine Leppard dated March 9, 2012," or "physical therapy records from Excel Physical and Occupational Therapy ("Excel") dated November 10, 2011 to March 21, 2012."  *See* R. at 2; Docket No. 18-2. Because plaintiff has failed to provide these pieces of rejected new evidence, the Court has no basis upon which to conclude that the Appeals Council erred in concluding that such evidence did not satisfy §§ 404.970(b) and 416.1470(b).

The Court turns to the category of evidence the Appeals Council explicitly rejected, but which is contained in Docket No. 18-2.  The Permanent Partial Impairment Report (the "Impairment Report") from Emergicare - Garden of the Gods appears to be a functional assessment of plaintiff's left hand mobility.  Docket No. 18-2 at 26-30.  The Impairment Report was authored by Dr. Pia Schalin and appears to have been completed based upon an April 24, 2012 functional capacity evaluation of plaintiff performed by Excel and plaintiff's May 2, 2012 visit with Dr. Schalin.  *Id.* at 26-27.  The Impairment Report details plaintiff's May 13, 2011 injury to her left hand/wrist, as well as the October 25, 2011 left carpal tunnel release and left wrist first dorsal compartment release procedures performed by Dr. Hart.  *Id.*  The report and supporting documentation concludes that plaintiff has a 13% upper extremity impairment based

26

upon symptoms related to her May 2011 left hand injury and that she is able to perform lifting at the light level for push pull, "sedentary level for high lift, mid lift, low lift, and carry," and was limited in her ability to reach and finger with her left hand. *Id.* at 28. The report states that plaintiff's condition is not likely to improve with further medical treatment or surgery. *Id.* Dr. Schalin further opined that plaintiff's left hand was permanently limited to lifting and carrying up to 5 pounds, pulling and pushing up to 20 pounds, and was entirely restricted from reaching, gripping, grasping, or repetitive motion. *Id.* at 25. Plaintiff argues that, because the Impairment Report reflects left upper extremity limitations that were caused by an injury predating the ALJ's decision, the Impairment Report is new and material evidence. Docket No. 17 at 15. However, although plaintiff's left hand injury may have occurred before the ALJ's decision, there is no indication that the injury was a disabling condition prior to the ALJ's decision. Dr. Qutub's July 2011 examination does not appear to have revealed any limiting conditions in plaintiff's left hand. *See* R. at 329-30. Although plaintiff had a procedure on her left hand in October 2011, there is no indication that her condition was disabling at the time or that plaintiff or her providers believed the condition would cause permanent limitations. To the contrary, as discussed above, one week after the ALJ's decision, Dr. Hart suggested that plaintiff could return to work "full duty" on December 5, 2011. R. at 405. Thus, the limitations set forth in the Impairment Report reflect the "subsequent deterioration of a previously non-disabling condition." *See Jones*, 122 F.3d at 1154. The Appeals Council did not therefore err in rejecting the Impairment Report as chronologically irrelevant. *Cf. Rhodes v. Barnhart*, 117 F. App'x 622, 627 (10th Cir.

27

2004) (unpublished) (holding that, where first reference to "radicular syndrome of pain" occurred in medical records dated after the ALJ's decision and no indication that plaintiff suffered from this condition prior to the ALJ's decision, records dated after ALJ's decision did not relate to time period for which benefits were denied).

The November 2012 MRI of the lumbar spine from Memorial, Docket No. 18-2 at 39-40, does not appear to have revealed a disabling condition and took place more than a year after the ALJ's decision.  Thus, it is neither material nor chronologically relevant. *See Jones*, 122 F.3d at 1154 (concluding that psychiatric report dated eight months after Appeals Council adopted the ALJ's decision did not relate to the time period for which benefits were denied).

The document referred to by the Appeals Council as an "April 2012 Functional Capacity Evaluation," R. at 2, appears to be a reference to an April 24, 2012 Impairment Evaluation (the "Excel Impairment Evaluation") conducted by Excel upon which the Impairment Report was partially based.  Docket No. 18-2 at 5-21; *see also id.* at 27.  The limitations set forth in the Excel Impairment Evaluation appear to be substantially similar to those in the Impairment Report and are chronologically irrelevant for the same reasons.

The May 9, 2012 letter from plaintiff's then-employer, Community Link, Inc. ("Community Link"), states that Community Link is unable to accommodate the limitations placed upon plaintiff by the "Physicians Report of Workman's Compensation Injury dated April 30, 2012" and was therefore terminating plaintiff's position as a Day Program Support Professional.  Docket No. 18-2 at 36.  Although the record and Docket No. 18-2 do not appear to include a document entitled Physicians Report of Workman's

28

Compensation Injury, there is no indication that the limitations the letter references were present during the relevant time period.  Rather, plaintiff continued to work in her position for several months after the ALJ's decision.  Thus, the Court cannot conclude that the Appeals Council erred in concluding that this evidence was chronologically irrelevant.

Docket No. 18-2 contains a written statement from plaintiff where she appears to criticize Dr. Qutub's report and discuss her work history, including Community Link's termination of her job.  Docket No. 18-2 at 43.  Docket No. 18-2 also contains a Work Performance Assessment dated April 18, 2013, which appears to have been completed by plaintiff's supervisor at Community Link.  *Id.* at 45-49.  In an August 26, 2013 letter, the Appeals Council rejected this evidence, concluding that it "does not appear to change the outcome."  Docket No. 18-1.  The Court agrees.  Plaintiff's statement primarily reiterates the subjective complaints already in the record, and her May 2012 termination from Community Link does not, for the reasons discussed above, evidence the existence of a disabling condition during the relevant time period.  The Work Performance Assessment states that, during her employment at Community Link, plaintiff worked 32-38 hours per week, which contradicts plaintiff's claims regarding how many hours a week she was capable of working.  Docket No. 18-2 at 45.  Although the document identifies certain difficulties plaintiff had in performing her job, the document does not indicate how frequently these difficulties occurred or when they occurred in relation to the ALJ's decision.  Thus, the Court finds that plaintiff's statement and the Work Performance Assessment, *id.* at 43-49, are not material and are chronologically irrelevant.

The Court next turns to that category of evidence which is contained in Docket No. 18-2, but which the Appeals Council did not expressly mention in either its May 22, 2013 notice [R. at 1] or its August 26, 2013 letter [Docket No. 18-1].  For purposes of resolving this motion, the Court assumes that the Appeals Council was in receipt of this category of evidence.    First, Docket No. 18-2 contains two notes from Premier Orthopedics ("Premier") dated October 17, 2011.  Docket No. 18-2 at 3-4.  Neither of these documents is material.  The notes predate plaintiff's wrist surgery and evidence only temporary, as opposed to permanent or extended, post-operative restrictions on plaintiff's use of her left wrist.  *See, e.g.*, Docket No. 18-2 at 3 ("No work x 3 days").  Second, Docket No. 18-2 contains three, one-page documents entitled "Reschedule Confirmation Notice," which appear to set forth plaintiff's scheduled physical therapy treatments in September and October 2012.  *Id.* at 22-24.  These documents are not material to the ALJ's conclusion that plaintiff was not disabled.  Third, Docket No. 18-2 contains a document entitled "Medical Expenses," which appears to list the medications plaintiff purchased from the Peak Vista CHC Pharmacy from January 2012 to November 2012.  *Id.* at 37-38.  This document is not material to the ALJ's decision and, moreover, does not appear to be chronologically relevant.

## III.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that the decision of the Commissioner that plaintiff was not disabled is **AFFIRMED**.

DATED September 30, 2015.

BY THE COURT:


 s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge